**MARYLAND SAVINGS–SHARE INSURANCE CORPORATION**

v.

**The UNITED STATES.**

**No. 154–75.**

United States Court of Claims.

Feb. 25, 1981.

---

6. $117,602.66 × 9,000/20,893 = $50,659.25.

7. $197,290.91 + $50,659.25 = $247,950.16.

Harry D. Shapiro, Baltimore, Md., for plaintiff. Jacques T. Schlenger, Baltimore, Md., attorney of record. Kenneth R. Hoffman, Baltimore, Md., of counsel.

Maxine C. Champion, Washington, D. C., with whom was Asst. Atty. Gen., M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

**PER CURIAM:**

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Philip R. Miller, Chief of the Trial Division, filed February 26, 1980, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the recommended decision as the basis for its judgment in this case. Accordingly, it is concluded that plaintiff is not entitled to recover, and the petition is dismissed.

## OPINION OF TRIAL JUDGE

MILLER, Trial Judge: This is a suit for refund of $25,473 in income taxes and interest paid for the year 1971.

The plaintiff, Maryland Savings-Share Insurance Corporation (MSSIC), was established by the Maryland legislature in 1962 for the purpose of insuring the accounts of depositors in savings and loan associations doing business in the state, which are not insured by the Federal Savings and Loan Insurance Corporation (FSLIC). MSSIC is a non-stock, non-profit corporation, supervised by its board of directors, eight of whom are elected by the savings and loan associations which are its members and three are appointed by the Governor of Maryland. However, the state has neither pledged nor authorized the use of its faith or credit for insuring the accounts.

As of 1971, the plaintiff guaranteed deposits (free share accounts) in 147 member institutions up to $30,000 per account and more recently to $40,000. To date, the plaintiff has never sustained a loss because of the default of a member institution.

The issue is whether plaintiff may deduct $177,877 either as a reasonable addition to a reserve for bad debts (pursuant to section 166 of the Internal Revenue Code)[1] or a reserve for incurred but not reported losses of an insurance company (pursuant to § 832(c)), or may only deduct bad debt or other losses if and when they occur.

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. All references to the Internal Revenue Code or to the Code are to the Internal Revenue Code of 1954 unless otherwise stated.

Plaintiff's bylaws and rules and regulations set forth the conditions of membership. Applicants must submit for examination by the membership committee and the State Department of Building, Savings and Loan Associations records of their fiscal affairs, officers and directors. The committee may disapprove an applicant if it finds that the applicant's financial policies or management are unsafe or unsound, or inconsistent with state law or plaintiff's bylaws and rules and regulations. Election to membership requires a favorable vote by a majority of plaintiff's board of directors. Each member must initially deposit and thereafter maintain on deposit with plaintiff an amount equal to 2 percent of its free share accounts. Any member may withdraw upon 12 months' notice and thereby become entitled to return of its capital deposit. Plaintiff may increase the required capital deposit upon the affirmative vote of 75 percent of its members, but any objecting member may resign within 30 days and become entitled to return of its capital deposit.

Plaintiff is not liable on its guarantee except in the event of default by a member association. The bylaws define an "event of default" as meaning an adjudication in bankruptcy, or the appointment of a conservator or receiver for a member by a court of competent jurisdiction. Upon the occurrence of such an event, plaintiff's insurance liability is the difference between the net proceeds of the sale of a member's assets at public auction and the unpaid balances in the depositors' accounts up to the insurable limit.

The rules and regulations provide that the insurance of a member's accounts becomes effective upon the issuance of a certificate of membership; and this in turn takes place after plaintiff's approval of the application and upon receipt of the applicant's approval of the application and upon receipt of the applicant's initial capital deposit. The insurance terminates on the date of repayment of the capital deposit. The bylaws provide that "No free share account issued by any member shall be insured after the termination date * * *."

Plaintiff obtains its income by investing the refundable capital deposits and receiving dividends and interest therefrom. On its financial statements, plaintiff designates its entire accumulated surplus as reserves. Although the capital deposits as well as the reserves may be used to pay losses, plaintiff prefers not to treat the deposits as reserves for such purpose, since any impairment of such funds would also reduce plaintiff's income-earning capacity and hence its ability to accumulate further reserves.

At the end of 1971, plaintiff's members' free shares aggregated $344,115,161, while plaintiff's total assets were $6,542,408, of which $5,905,000 were capital deposits and $572,164 were reserves.

During 1971, plaintiff obtained permission from the Internal Revenue Service to change its method of accounting from the cash receipts and disbursements method to the accrual method. Thereafter, in its income tax return for that year plaintiff elected the reserve method with respect to accounting for bad debts. It took a $177,877 deduction for a reasonable addition to a reserve for bad debts. The effect of the deduction was to eliminate plaintiff's entire income of $70,433 and to create a net operating loss of $107,444.

The deduction was calculated in the following manner: (a) Plaintiff started with the average aggregate free share deposits of plaintiff's members during 1971. (b) From this it subtracted the average capital deposits in plaintiff's possession through 1971, the average aggregate reserves and profits of plaintiff's members, and the aggregate amounts in free share accounts in excess of the then insured $30,000 per account. (c) It divided the remainder by 147, the average number of its member institutions for 1971. These calculations produced the sum of $1,778,775, which in plaintiff's view represented its average exposure per member institution to loss on insured free share accounts. (d) It then divided this sum by 10 to arrive at what it believed was a proper deduction for a single year (apparently on the assumption either

that such a loss would occur only once in 10 years or that the average loss it might incur would be 10 percent of the free share accounts of a member).

On audit a revenue agent disallowed the deduction on the grounds that: (1) until plaintiff had to make good a loss resulting from the default of a member, it was owed no debt which could be the subject of a deduction for an addition to a reserve for bad debts; (2) plaintiff was barred by § 166(f)(2) from taking a deduction for an addition to a reserve for bad debts which might arise out of its liability as a guarantor; and (3) plaintiff had never had any bad debts (over the prior 11 years) and had failed to establish a reasonable reserve. The Internal Revenue Service sustained the revenue agent's report.

## I

Section 166(a) of the Internal Revenue Code allows a deduction for any debt which becomes worthless within the taxable year. In lieu of a deduction under subsection (a), subsection (c) allows (in the discretion of the Commissioner of Internal Revenue) "a deduction for a reasonable addition to a reserve for bad debts."

Plaintiff claims that § 166(c) allows the deduction it seeks. The Government, however, defends on the theory that § 166(c) is inapplicable because § 166(f)[2] is the exclusive section which governs the deduction of an addition to a reserve for bad debts by a guarantor whose bad debts *may* arise out of his potential payment of the debtor's liability to a third person. That section provides:

(f) Reserve for certain guaranteed debt obligations.—

(1) Allowance of deduction.—In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction—

(A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of his trade or business; * * *

\* \* \* \* \* \*

(2) Deduction disallowed in other cases. —Except as provided in paragraph (1), no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations.

The parties have stipulated and it is otherwise clear both that plaintiff is a guarantor of its members' liabilities to its depositors and that plaintiff has never been a dealer in property. Literally, therefore, § 166(f)(2) applies, and no deduction may be allowed to plaintiff for any addition to a reserve for bad debts which may arise out of its liability as a guarantor.

Plaintiff urges, however, that the meaning of § 166(f)(2) should not be derived solely from a literal reading. It contends that § 166(f)(1) was designed exclusively to resolve problems relating to a dealer in property who sells his accounts receivable to a finance company with the latter withholding part of the price as a reserve in the event the customer does not pay up his account in full and the dealer has to make good on his guarantee to the finance company. Therefore, the argument goes, § 166(f)(2) should be understood to be merely a limitation on the operation of § 166(f)(1) (*i.e.*, it bars deductions only to a dealer in property who cannot comply with the conditions of § 166(f)(1)); and it has no application to a guarantor, such as MSSIC, who is not a dealer in property, and therefore remains entitled to the deduction under §§ 166(a) and (c).

**2.** Prior to 1976 § 166(f) was designated as § 166(g). It was changed by Pub.L.No. 94–455,

§ 605, 90 Stat. 1575 (1976).

However, in view of the clear-cut language of § 166(f)(2), it would require the most unambiguous and forceful evidence of legislative intent to warrant the conclusion that Congress did not mean what it said.

As evidence of such legislative intent, plaintiff cites the following excerpt from the House committee report on the enactment of § 166(f) (H.R.Rep.No. 2157, 89th Cong., 2d Sess. 1, 1966–2 C.B. 905, 906): [3]

> This bill provides that a taxpayer who is a dealer in property may take an income tax deduction for reasonable additions to a reserve for bad debts which arise from his contingent liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of the dealer's business. The bill also provides that *this is to be the only deduction allowable for additions to a reserve for bad debts for obligations of this type.* [Emphasis supplied.]

Plaintiff argues that "obligations of this type" refers to obligations of a dealer in real or tangible personal property, and therefore it was not intended that a guarantor who is not a dealer in property be barred from the deduction by § 166(f)(2).

There are several difficulties with this argument. First, even as a matter of syntax, it is at least equally probable that "obligations of this type" refers to a contingent liability to a guarantor, endorser or indemnitor rather than to an obligation of a dealer in property. Second, plaintiff does not explain, and it is difficult to understand, what purpose consistent with plaintiff's argument Congress could have had for enactment of § 166(f)(2). Third, other portions of the same committee report dealing with § 166(f)(2) are not susceptible to the limitation plaintiff urges, to wit (*Id.* at 5, 7, 1966–2 C.B. at 907–909, 909–910):

**III. GENERAL EXPLANATION**

\* \* \* \* \* \*

*New reserve only way of taking guaranteed bad debt deduction for future.—* The bill provides that the new reserve previously described is to be the only reserve through which a deduction is to be allowed for any addition to a reserve for bad debts which arises out of the taxpayer's liability as a guarantor, endorser, or indemnitor of debt obligations. For example, if the taxpayer has an account receivable from a customer simply for services rendered (not in connection with a sale of a property) the bill provides that no deduction is to be allowed for an addition to a reserve for liabilities arising out of the sale with recourse of such a debt obligation.

\* \* \* \* \* \*

**IV. TECHNICAL EXPLANATION**

**SECTION 1. RESERVE FOR CERTAIN GUARANTEED DEBT OBLIGATIONS**

\* \* \* \* \* \*

*Deduction disallowed in other cases*

Subsection (g)(2) [4] of section 166 of the code, as added by subsection (a) of the first section of the bill, provides that no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations except as specifically provided for in subsection (g)(1)(A), as added by this section of the bill.

Fourth, § 166(f)(1) allows a deduction for a bad debt reserve for a guarantee arising not only out of the sale of property but also out of the sale of related services. The committee report states that the related services include such things as additional charges for delivery of a television set and for a repair service contract. The report then goes on to state (*Id.* at 6, 1966–2 C.B. at 909): "However, if such dealer does not

---

**3.** Since S.Rep.No. 1710, 89th Cong., 2d Sess., is substantially identical to H.R.Rep.No.2157, references hereinafter will be only to the House report.

**4.** *See* n.2, *supra,* at 19.

sell the service contract contemporaneously with the sale of the television set or the service contract includes television sets in addition to the one sold by the dealer, such service contract is not a related service." The clear implication is that a bad debt reserve for a guarantee arising out of other than a sale of property is barred by § 166(f)(2).

Plaintiff also contends that § 166(f) was enacted to ameliorate the rigor of the Commissioner's position regarding the bad debt reserve of a dealer in property who sells or discounts his receivables. This is undoubtedly true, but the Commissioner's position was based on broad principles of tax law applicable to others as well: That until a guarantor is required to make good on his guarantee there is no debt, and a prior reserve for bad debts under such circumstances would be an unallowable contingency reserve. Thus, even if Congress intended to benefit dealers in property, it was not utterly unreasonable for it to have barred reserve deductions by other guarantors.

The circumstances which gave rise to the enactment follow:

Prior to 1956, there was a conflict among the circuit court decisions as to whether a guarantor who made good on his guarantee after the insolvency and default of the principal thereby sustained a bad debt or a loss. In the former event, if the debt was not incurred in the taxpayer's business it resulted in short-term capital loss, deductible only to the extent of $1,000 per year in excess of capital gains (I.R.C. §§ 166(d), 1211(b)); in the latter event it was fully deductible if it was incurred in any transaction entered into for profit although not connected with a trade or business. (§ 165(c).) The arguments against bad debt treatment were that the loss resulted from the payment of the guarantor rather than the nonrepayment to the guarantor by the insolvent principal, and that if any debt from the principal to the guarantor arose at the time of the payment it was worthless at its inception and could not *become* bad.[5] However, in *Putnam v. Commissioner,* 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956), the Supreme Court held that bad-debt treatment was proper for the guarantor's loss because (at 85):

> *instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. Thus, the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt.

and (at 88–89, 77 S.Ct. at 178–79):

> Under the doctrine of subrogation, payment by the guarantor, as we have seen, is treated not as creating a new debt and extinguishing the original debt, but as preserving the original debt and merely substituting the guarantor for the creditor. The reality of the situation is that the debt is an asset of full value in the creditor's hands because backed by the guaranty. The debtor is usually not able to reimburse the guarantor and in such cases that value is lost at the instant that the guarantor pays the creditor. But that this instant is also the instant when the guarantor acquires the debt cannot obscure the fact that the debt "becomes" worthless in his hands.

Although *Putnam* holds that once a guarantor pays his liability as such, his relationship to the defaulted debtor becomes that of a creditor, so as to provide the statutory framework for a bad debt deduction for his actual loss, the case does not deal at all with the allowability of a deduction for an addition to a *reserve* for bad debts by a guarantor prior to any default.

In 1959 the Supreme Court decided that even if a finance company purchasing the installment accounts receivable of a seller of property withholds a portion of the price for each account and credits it to a reserve account for the dealer to insure perform-

---

5. *Pollak v. Commissioner,* 209 F.2d 57 (3d Cir. 1954); *Edwards v. Allen,* 216 F.2d 794 (5th Cir. 1954); *Cudlip v. Commissioner,* 220 F.2d 565 (6th Cir. 1955).

ance of the dealer's guarantee of the account, the amount in the reserve account nevertheless represents accrued income to the dealer. *Commissioner v. Hansen*, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959). Thereafter a number of such dealers sought to offset the effect of the *Hansen* decision by deducting the dealer reserve withheld by the finance company as an addition to a reserve for bad debts. But the IRS ruled that the Internal Revenue Code does not allow such a deduction because the liability therefor is contingent, and that it cannot be justified as an addition to a reserve for bad debts because (under the theory of *Putnam*) until the guarantor is called upon to make good the obligation of the primary obligor there is no existing bona fide debt owing to the taxpayer arising from a debtor-creditor relationship as required by sections 1.166–1(a) and (c) of the Treasury Regulations (Rev. Rul. 62–214, 1962–2 C.B. 72). The Tax Court consistently agreed with the Commissioner.[6] However, on appeal, three circuits reversed the Tax Court and permitted a deduction for a reserve by a guarantor on the theory that the debt need not be owing to the taxpayer at the time of the deduction for the reserve if there is an existing debt and the taxpayer may ultimately sustain a bad debt loss thereon.[7] The Commissioner continued to adhere to his position. The House committee report indicates that, the purpose of Congress in the enactment of § 166(g) was to settle the controversy between the Commissioner and the circuit courts: by allowing a deduction for a bad debt reserve to a dealer in property who had guaranteed the accounts receivable he had discounted or sold to a finance company;[8] but (as the excerpts from the committee report previously quoted show) by disallowing such a deduction to other guarantors.

The congressional decision to confine the allowance of a deduction for a guarantor's contingent loss to the narrow category of dealers in property and to exclude others is consistent with actions taken by Congress in prior years with respect to deductions for reserves for estimated expenses generally. In the Internal Revenue Code of 1954, as originally enacted, §§ 452 and 462 were included to eliminate some of the variances between tax accounting and business accounting. The first section allowed the deferral of prepaid income to the year when earned, and the second allowed generally a deduction for reasonable additions to a reserve for estimated expenses even if all events which fixed the fact and amount of the taxpayer's liability had not yet occurred (26 U.S.C. §§ 452, 462 (Supp. II 1952); H.R. Rep.No. 1337, 83rd Cong., 2d Sess. 48–49; S.Rep.No. 1622, 83rd Cong., 2d Sess. 62–64, *reprinted in* [1954] U.S.Code Cong. & Ad. News 4025, 4074, 4695). However, only one year later Congress repealed both sections retroactively out of concern for the drastic loss of revenue and protracted litigation

6. *Bolling v. Commissioner*, 23 TCM 865 (1964); *Foster Frosty Foods, Inc. v. Commissioner*, 39 T.C. 772 (1963); *Wilkins Pontiac v. Commissioner*, 34 T.C. 1065 (1960); *Mike Persia Chevrolet, Inc. v. Commissioner*, 41 T.C. 198 (1963).

7. *Bolling v. Commissioner*, 357 F.2d 3 (8th Cir. 1966); *Foster Frosty Foods, Inc. v. Commissioner*, 332 F.2d 230 (10th Cir. 1964); *Wilkins Pontiac v. Commissioner*, 298 F.2d 893 (9th Cir. 1963).

8. The committee report stated (*Id.* at 2, 1966–2 C.B. 905, 906):
   "II. REASONS FOR THE BILL
   "The Internal Revenue Service takes the position that a dealer in property is not entitled to take a current deduction, by use of a reserve for bad debts for losses he expects to arise in subsequent years because of his sale with recourse of customer debt obligations. For example, if a dealer sells an article under a conditional sales contract and then sells the contract to a bank with the bank reserving the right to collect any bad debts from the dealer, the Internal Revenue Service holds that an addition to a reserve for bad debts on account of the dealer's contingent liability to the bank cannot be deducted for income tax purposes. The Treasury's position has been sustained in the Tax Court of the United States, but three circuit courts of appeal have held that a current deduction can be so taken against the future losses. The Commissioner of Internal Revenue has announced that he will not follow the circuit court decisions. The bill is designed to settle the existing controversy as to the proper treatment of such cases for both future and past years. [Footnote omitted.]"

which were likely to result from the measures. (Act of June 15, 1955, ch. 143, 69 Stat. 134; H.R.Rep.No. 293, 84th Cong., 1st Sess. 3 (1955–2 C.B. 852, 854).) This has been deemed evidence of congressional intent not to allow either the deferral of income or the anticipation of losses or expenses without specific authorization. *American Automobile Association v. United States*, 367 U.S. 687, 694–95, 81 S.Ct. 1727, 1730–31, 6 L.Ed.2d 1109 (1961); *Quality Chevrolet Co. v. Commissioner*, 50 T.C. 458, 462–63 (1968), aff'd, 415 F.2d 116 (10th Cir. 1969).

The scope of § .166(f)(2) has been litigated in several cases since its enactment. These decisions uniformly hold that the section bars a deduction for an addition to a bad debt reserve by a guarantor who is not a dealer in property. *Travis v. Commissioner*, 47 T.C. 502 (1967), *aff'd in part and rev'd in part on other issues*, 406 F.2d 987 (6th Cir. 1969); *Budget Credits, Inc. v. Commissioner*, 50 T.C. 52 (1968); *aff'd per curiam*, 417 F.2d 1108 (6th Cir. 1969); *Colter Corp. v. Commissioner*, 32 TCM 997 (1973), *aff'd per curiam*, 35 AFTR2d 461 (4th Cir. 1974); and *High Plains Agricultural Credit Corp. v. Commissioner*, 63 T.C. 118 (1974).

In *Travis*, the taxpayer was held not entitled to a deduction for an addition to a reserve for bad debts because the discounted debts it guaranteed arose out of its contracts to furnish dancing lesson services rather than from sales of property. In *Budget Credits, Inc.*, the 'taxpayer was a wholly-owned subsidiary of a department store. It purchased its parent's accounts receivable and then resold them to a bank with taxpayer guaranteeing the accounts. Even though the parent would have been entitled to deductions for a bad debt reserve, the court held that the taxpayer was

barred from the deductions by § 166(f)(2), because it was a separate legal entity and was not itself a dealer in property. In *Colter Corp.*, the taxpayer, a life insurance agent or broker, lent money to the purchasers of the insurance and then assigned or sold their obligations to financial institutions, remaining liable solely as guarantor. Again, the taxpayer was denied a deduction for a bad debt reserve because the obligations it guaranteed did not arise out of the sale of property, pursuant to § 166(f). In *High Plains Agricultural Credit Corp.*, the taxpayer made loans to farmers and ranchers and then sold them on a discounted recourse basis to the Federal Intermediate Credit Bank. The Tax Court held that the taxpayer was not entitled to a deduction for a reserve for bad debts attributable to its liability as guarantor because (at 126)— "Congress enacted section 166(g) as the exclusive provision for deductions for additions to the reserve of a guarantor, endorser, or indemnitor", and the court found "no merit to petitioner's argument that section 166(g)(2) has no application to 'taxpayers whose primary business is lending money.' "

## II

We come now to plaintiff's argument that the deduction is allowable as an addition to a reserve for incurred but not reported (IBNR) losses of an insurance company. Defendant contends first that plaintiff cannot qualify for any deduction allowable to insurance companies because plaintiff is not an insurance company within the meaning of the Internal Revenue Code.[9] However, it is unnecessary to decide that question here, because the deduction plaintiff seeks is not for an incurred loss in any event.

---

9. Prior to completion of a stipulation of facts at the pretrial stage, defendant asked for an extension of time to consider the opinion of the Internal Revenue Service that MSSIC is an insurance company under the tax laws. However, defense counsel ultimately decided against that view. Plaintiff contends that defendant has nevertheless admitted that MSSIC is an insurance company and that the Justice Department has no right to take a position

contrary to that of the Service. I find no admission to a third party in a communication of an opinion from a client to its counsel. Furthermore, the Attorney General and his properly delegated subordinates are not bound by the views of the Internal Revenue Service; the question being one of law (the pertinent facts being undisputed) the court is not bound by either view. *Kornhauser v. United States*, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505 (1928).

Section 831 of the Internal Revenue Code imposes a tax on the income of insurance companies (other than life or mutual) in lieu of the tax imposed by § 11 of the Code on other corporations. Section 832 defines insurance company taxable income to mean gross income less various deductions, including "losses incurred." Section 832(b)(5) provides that "losses incurred" means "losses incurred during the taxable year" on insurance contracts, computed (in part) by "add[ing] all unpaid losses outstanding at the end of the taxable year and deduct[ing] unpaid losses outstanding at the end of the preceding taxable year." Rev.Rul. 70–643, 1970–2 C.B. 141, in turn explains that the scope of incurred losses and unpaid losses includes "losses that have been incurred but have not been reported" within the taxable year. Since the money is not actually paid out during the taxable year, the amount is estimated and deducted by way of an addition to a reserve.

Rev.Rul. 70–643 makes it clear that an incurred but not reported loss refers to a present loss and not one that is merely likely to occur in the future. The ruling draws its support for the deduction from section 832(b)(5) of the Code which, as noted above, states that "losses incurred" means "losses incurred during the taxable year," and from section 1.832–4(a)(5) of the Treasury Regulations, which provides that in computing the incurred losses the determination of unpaid losses at the close of each year "must represent actual unpaid losses as nearly as it is possible to ascertain them."

The deduction for an incurred but not reported loss did not originate with Rev. Rul. 70–463. As that ruling itself indicates, it goes back at least as far as GCM 2318, VI–2 Cum.Bull. 80, published in 1927. The IBNR loss has also been included as a deductible unpaid loss in the forms for the annual statement approved by the National Association of Insurance Commissioners for more than 50 years. Computation of casualty insurance company gross income and expenses in accordance with the underwriting exhibit of the annual statement of the Association has been prescribed by the internal revenue laws since 1921,[10] and it has been noted by this court that "The terminology and concepts of the Internal Revenue Code and Regulation provisions dealing with casualty insurance are based directly on industry usage developed in response to state regulation." *Continental Insurance Co. v. United States*, 200 Ct.Cl. 552, 561, 474 F.2d 661, 666 (1973); and see also *Commissioner v. New Hampshire Fire Insurance Co.*, 146 F.2d 697, 700 (1st Cir. 1945).

Dr. David Cummins, an associate professor of insurance at the University of Pennsylvania and author and editor of numerous books and articles in the field of insurance, appearing as defendant's witness, testified that in the understanding of those versed in the terminology of the insurance industry—

the incurred but not reported reserve is for claims which meet two primary conditions. First of all, they must be reserves set up for losses which have been incurred and second, those incurred losses must have not yet been reported to the insurance company * * * the definition of losses incurred is losses for which the insurance company has become liable during the policy period by virtue of the policy definition. So a loss is incurred only if it has been settled that the company is liable under the definition in a specific policy.

*Cummins' definition is consistent with* that of the American Institute of Certified Public Accountants, *Audits of Fire and Casualty Insurance Companies* (1966), which states (at 71, 79):

Losses Incurred But Not Reported (IBNR)—Losses resulting from accidents or occurrences which have taken place but on which the company has not yet received notices or reports of losses.

\* \* \* \* \* \*

Incurred Losses (Claims)—Losses paid or unpaid for which the company has become liable during the period.

A classic actuarial article defines the term as follows:

---

**10.** Revenue Act of 1921, ch. 136 §§ 246(b)(1), (7), 42 Stat. 263; I.R.C. §§ 832(b)(1), (6).

A claim arising out of an event or accident which occurred in, or prior to, a certain date, but notice of which was not received by the home office of the company until after such date.[11]

A leading insurance textbook furnishes the following examples of incurred but not reported losses (assuming December 31 as the date as of which the loss is computed):

1  A serious automobile accident occurs on December 31, but the claim is not reported to the home office of the insurer until January 10.

2  Under a bodily injury liability contract covering a public restaurant, claim for damages for bodily injuries is made on January 25, alleging that the injury resulted from eating impure food in the restaurant on December 20.

3  An employee insured under a group hospitalization contract enters a hospital in December, but the insurer does not receive notice of the claim until after the employee leaves the hospital in January.

4  A sever storm, occurring late in December, causes damage to thousands of dwellings in several states, but a large number of the claim reports are not received in the home office until after January 1.[12]

The same text also sets out various methods commonly used in the insurance industry to determine the amount of such reserves, to wit:

(1) "[F]rom reports received during the first ten days or two weeks following December 31, or other reserve date."

(2) From "The relationship of the incurred-but-not-reported reserve to the reserve for known cases as developed for one or more years in the past", modified to reflect current conditions.

(3) From "the ratio of incurred-but-not-reported losses incurred during a calendar year to the total losses incurred during the previous calendar year * * for the four latest years."

(4) From "a record of the actual claims incurred in the previous calendar year but reported in the next calendar year."

(5) From "relating the incurred-but-not-reported reserve to premiums in force [or] premiums written." [13]

Plaintiff does not appear to differ substantially with these definitions of an IBNR loss, for in its reply brief it states:

[T]raditional concepts of an incurred but not reported loss reserve * * * consists of an estimate of the future amount the company will be required to pay as a result of liability which attaches in a current year.

* * * * * *

[W]hen MSSIC claims that its reserve is being set up for the ultimate loss, it is referring to the amount that it will ultimately be required to pay as a result of its liability for events which occurred in 1971.

and—

[A]n IBNR reserve is an estimate, based on probabilities, of the amount of losses that the company will incur as a result of its insurance liability in a particular year.

Where plaintiff's case falls down is in carrying its burden of proof that it incurred any insurance liability in 1971 for events occurring in that year.

Plaintiff's method for computing a reserve for incurred but not reported losses as of the end of 1971 was derived from the combined testimony of two of its witnesses, Dr. Nevins Baxter, an economist specializing in commercial banks, and Dr. Joseph Thomas White, a member of the economics faculty at Georgetown University, neither

11. T. Tarbell, *Incurred But Not Reported Claims Reserves*, 58 Proceedings, Casualty Actuarial Society 84 (1971); also quoted with approval in J. Wilkerson, *A Claimsman's View of IBNR*, CPCU Annals, Vol. 28 at 5 (1975).

12. J. Michelbacher and N. Roos, *Multiple-Line Insurers—Their Nature and Operations* 183 (2d ed. 1970).

13. *Id*. at 187–88.

of whom is an expert either in insurance or taxes.

Dr. Baxter gave opinion testimony as follows: The precondition for the failure of a financial institution is generally bad or incompetent management, bad loans or malfeasance. Failures may be traced back to such conduct or acts. Therefore, the occurrence of such a course of conduct or bad events may be deemed the incurred loss, and the determination by the insurer of its actual loss may be deemed the reported loss. The typical lag time between the occurrence of a bad event to a financial institution and the loss to the insurer of the institution is 10 years: 2 years before the regulatory agency discovers it; 2 to 3 years between the discovery and the time the insurer takes formal action, such as supervision, conservatorship or receivership; and 5 years more until the amount of the loss to the insurer becomes known after liquidation of the institution's assets.

Thereafter, Dr. White computed the probability of plaintiff incurring a loss in the following manner: Because MSSIC had no loss experience, he computed its probability of loss on the basis of FSLIC's experience. Over its 43–year history FSLIC, having approximately 3,250 members, reported encountering 116 distress situations necessitating its taking formal action. This works out mathematically to an average of 27 formal actions per 10 years or .0083 actions per member per 10 years. Applying the .0083 to MSSIC's 147 members as of the end of 1971 results in an average of 1.2 bad events per 10 years in which MSSIC could be expected to take such formal action as placing a member in receivership, arranging a merger or making a formal contribution or loan. On the assumption that the bad events would be random, he computed the probability of zero bad events per decade to be 30 percent, one event 36 percent, two events 22 percent, three events 9 percent, and four events 2 percent.

Dr. White then computed the probability that if losses occurred they would exceed a $1 million reserve fund. On the basis of the experience of the Ohio Deposit Guaranty Fund and of FSLIC, he made the judgment that when a loss occurred it was in the average amount of about 10 percent of the insured member's assets, and he assumed that MSSIC's experience would be similar. As of the end of 1971, MSSIC had 11 members with assets exceeding $10 million, which at a 10 percent loss rate could produce a $1 million loss in a single failure. Since 11 represents 8 percent of MSSIC's 147 total membership, he estimated the probability of a single loss to MSSIC exceeding a $1 million reserve fund at 8 percent, and he computed the probability of two such losses at 19 percent, three at 22 percent and four at 80 percent.

Combining the last two computations, Dr. White calculated that the risk of depletion of the $1 million reserve by one event per decade was 3 percent, by two events 4 percent, by three events 2 percent and by four events 2 percent. Adding these percentages together, he concluded there was an 11 percent probability that the $1 million reserve would be depleted by losses as a result of either one, two, three, or four bad events in a decade.

Dr. White then made similar computations to ascertain the risk of depletion of a $2 million and of a $3 million reserve in a decade by the failure of MSSIC members having $20 million and $30 million in assets (again assuming an average 10 percent loss). There were of course fewer members of such size than those having $10 million in assets. He determined that if MSSIC set aside a $2 million reserve in 1971 there would have been a 3½ percent risk that it would be wiped out by losses over a 10–year period. But with a $3 million reserve he calculated such risk at only 2 percent. Since, in the judgment of plaintiff's management and of White himself, a 2–percent risk was acceptable, in his opinion a $3 million reserve for insured losses for MSSIC was reasonable.

Alternatively, Dr. White computed the "expected value" of an IBNR reserve for MSSIC for 1971 at $340,000. This was obtained by finding the average-sized association as of 1971, multiplying it by the 1.2

average number of bad events per decade (for FSLIC), and then taking 10 percent of that average on the assumption that the average loss will be 10 percent of an association's assets. The reserve required for 1971 on that theory would be $340,000. He did not furnish supporting figures for this computation.

Dr. White's computations in arriving at the conclusion that plaintiff required a $3 million reserve fund to safeguard it against loss are vulnerable to several major criticisms. First, the record is unclear whether and to what extent the 116 formal actions taken by FSLIC caused loss to the insurer. The parties stipulated that in only 13 of the 116 cases were there failures by the savings and loan associations involved. In most of the remaining cases, the associations were merged with other institutions.[14] Nor can it be ascertained from the record whether even in the 13 instances the liquidation of their assets resulted in any loss to FSLIC.[15] The Cooperative Central Bank of Massachusetts, which the parties stipulated is "a guarantee fund similar to Plaintiff", liquidated nine banks from 1934 to 1936 but suffered no loss because the proceeds from the sales of assets were always sufficient to reimburse the fund for amounts it paid to depositors. Furthermore, FSLIC commenced operations in 1934 during the great economic depression, when there were extensive home mortgage foreclosures with nominal realizations on the sales. Therefore, in the absence of evidence as to when the FSLIC losses occurred, it can hardly be a fair model for estimating plaintiff's risks as of 1971. Nor did Dr. White explain why he disregarded completely in his predictions

the experience of the Massachusetts fund, which the parties stipulated has never suffered any losses since its creation in 1934. In addition, the computation ignores the fact that as of 1971 plaintiff already had reserves of $572,164. Finally, the computation gives no effect to the income tax refunds to which plaintiff would be entitled as a result of loss carrybacks in the event of losses requiring the use of accumulated reserves.

More important, whatever pertinency the calculations may have to the determination of a proper reserve for contingencies, they have no reliance to the ascertainment of a reserve for "incurred but not reported losses." Dr. Baxter's testimony was presumably designed to show that when losses occur to the insurer they do not spring up full grown but are seeded by events typically occurring 10 years earlier. But such testimony, even if it were more precise and its supporting data available for evaluation,[16] would not show that bad or improvident loans, or other actions of bad, incompetent or dishonest management represent present losses to the insurer which will necessarily or even probably result in the reporting of loss 10 years later. Dr. Baxter conceded that "some of these bad loans ultimately are paid off and some of the institutions that make bad loans ultimately don't fail." Moreover, since savings and loan associations are required to accumulate their own reserves to protect them against loss, they may suffer unwise, negligent or dishonest acts by their officers, employees or others without becoming insolvent and defaulting in their obligations to their depositors.[17]

---

14. Plaintiff claims that even in such mergers there could be losses of income by way of interest-free advances. But the Internal Revenue Code allows no deduction for loss of unreported income. *Ruffin v. United States*, Ct.Cl. No.500–78, Order dated Jan. 4, 1980; *Anderson Clayton & Co. v. United States*, 144 Ct.Cl. 106, 168 F.Supp. 542 (1958); *W.L. Moody Cotton Co. v. Commissioner*, 143 F.2d 712 (5th Cir. 1944).

15. Where a plaintiff has sought to establish a fact by a stipulation and the stipulation is inadequate for that purpose, the net effect is that the plaintiff has failed to carry his burden of

proof. *Boehm v. Commissioner*, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1946).

16. The witness expressly declined to testify that his 10-year estimate represents any kind of objective mathematical average.

17. Indeed, there was stipulated evidence in the record that three of plaintiff's members suffered bad events without plaintiff having to incur any loss. In one case, plaintiff advanced funds to the member, but upon liquidation of the member's portfolio the amount realized was sufficient to reimburse plaintiff. In two

Nor is Dr. Baxter's testimony persuasive that if the losses are in fact reported to the insurer they may properly be deemed to have been incurred 10 years earlier. As previously mentioned, both sides agree that losses "incurred" means losses for which the insurer has become *liable* during the taxable year even if they have not yet been reported to it. Plaintiff's bylaws and rules and regulations define the conditions of its liability. Article VII, section 3, of its bylaws provides that "No payment shall be made by the Corporation with respect to its insurance liability unless an event of default shall have occurred * * * and until such insurance liability shall have been determined in accordance with Section 4 * * *." "Event of default" is defined by the same section to mean "for any member (a) its adjudication in bankruptcy * * *, (b) the appointment of a conservator * * *, or (c) the appointment of a receiver for its affairs" by a proper court. Under that definition, even if an embezzlement takes place or one or a series of bad loans is made by a member during a particular year, plaintiff incurs no liability unless such occurrence leads to an event of default during the same period.[18]

Assuming *arguendo* that plaintiff may be deemed to have incurred a loss when a member savings and loan association has become insolvent in the bankruptcy sense and is unable to pay all of its depositors even though no formal adjudication of bankruptcy or appointment of a receiver has yet taken place, nothing in Dr. Baxter's testimony supports the thesis that the interval between a member's actual *insolvency* and its reporting to plaintiff is typically 10 years.

The very terminology used by Dr. White in the charts he used to explain his calculations demonstrates that he was not estimating the reserve needed for losses that MSSIC had already incurred in 1971 but was only measuring the risks that it *might* incur losses over the next 10 years and estimating the size of the reserve it might need to meet such contingencies. The first chart he prepared to explain his calculations was entitled "Calculation of Depletion Probabilities with Reserve Fund of $1 Million (Based on Members' Assets as of December 31, 1971)," and its column headings were "Probability of Occurrence", "Probability of Loss Exceeding Reserve Fund" and "Probability of Depletion by Occurrence" if one, two, three or four events should happen. His second chart was entitled "Depletion Probabilities Relative to the Size of the Reserve Fund (Risk Function) 1971." As previously noted, on the first of these charts, Dr. White computed that there was a 30–percent probability that no bad events giving rise to a loss would occur in a 10–year period and a 36–percent probability that one such event would occur, with lesser degrees of probability for more than one. Treasury Regulations 1.832–4(b) provides that in computing the deduction for "losses incurred" the unpaid losses at the close of the year must comprise only "actual unpaid losses." Even if correct, a 36–percent probability of a loss is not an estimate of an *actual* loss but only of a possibility that there may be one. No provision in the Code allows a deduction for a reserve for such a contingency. In connection with a claimed deduction for estimated losses the Supreme Court has stated, "Financial accounting * * is hospitable to estimates, probabilities, and reasonable certainties; the tax law, with its mandate to preserve the revenue, can give no quarter to uncertainty." *Thor Power Tool v. Commissioner*, 439 U.S. 522, 543, 99 S.Ct. 773, 786, 58 L.Ed.2d 785 (1979).

other instances, plaintiff was not required to advance any funds.

18. Plaintiff's witness, Donald I. Hunsche, executive vice-president of the Ohio Deposit Guaranty Fund, also testified that in estimating the time between the occurrence of conditions giving rise to loss to the insurer and the reporting of the loss it is difficult to establish a starting point, because even after embezzlements and other bad practices there need not be default to depositors; bad loans may have been reasonable when they were made; payments may be current even on loans otherwise deemed of doubtful value; and liability is not incurred by the insurer until the association becomes insolvent.

Substantially the same criticisms are applicable to Dr. White's alternative computation of the "expected value" of an IBNR reserve for 1971. Such computation has no relation to losses actually incurred.

## III

Finally, plaintiff complains in its brief that denial of the tax deduction it seeks is inequitable because it would deny it the opportunity to build up its reserves on a tax-free basis in the same manner as older financial institutions having bad debt experience, and that it should not be penalized because "Congress has simply not legislated with plaintiff in mind."

The quoted remark is simply not true. Congress has been fully aware of plaintiff's complaint, and its failure to act in plaintiff's favor is not because it has overlooked plaintiff's situation. This is shown by the history of legislation and abortive legislative efforts dealing with the subject, part of which is summarized in *United States v. Maryland Savings-Share Ins. Corp.*, 400 U.S. 4, 5–6, 91 S.Ct. 16, 17, 27 L.Ed.2d 4 (1970).

Prior to 1951, all savings and loan associations were exempt from taxation of income derived from their operations, as were the nonprofit corporations that insured the savings institutions. In 1951, the exemption for savings and loan associations was removed on the basis of a congressional finding that the purpose of the exemption, to afford savings institutions which had no capital stock the benefit of tax exemption so that a surplus could be accumulated to provide the depositors with greater security, was no longer applicable, because the savings and loan industry had developed to the point where the ratio of capital account to total deposits was comparable to commercial banks which did not have an exemption. The exemption for their insurers, however, was continued, provided they were organized prior to September 1, 1951. Congress received assurances that the revenue effect of the exemption would be limited to the four private insurers in existence at the time (two in Massachusetts, one in Connecticut and one in New Hampshire).[19]

However, after the Ohio Deposit Guaranty Fund was organized in 1956, in 1960 Congress extended the cut-off date from 1951 to September 1, 1957, to exempt the Ohio fund as well.[20] The extension was granted to the Ohio fund because it had been organized at a time when the savings and loan associations were essentially not taxed, as a result of generous bad debt reserve provisions also enacted in 1951. S.Rep.No. 1881, 87th Cong., 2d Sess. 40, *reprinted in* [1962] U.S.Code Cong. & Ad. News 3304, 3342–43. It was not until 1962 that the bad debt reserve provisions were modified and the loophole created in 1951 was closed. It appears that Congress decided it was "only fair to extend the same exemption to the Ohio corporation that was enjoyed by those who were organized before the original attempt to tax the savings and loans." *Maryland Savings-Share Ins. Corp. v. United States*, 308 F.Supp. 761, 770 (D.Md.), *rev'd*, 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970)).

MSSIC having been organized in 1962, in 1963 a similar bill (H.R.Rep.No. 3297, 88th Cong., 1st Sess.) was introduced to move the cut-off date forward to January 1, 1963, for its benefit. The bill passed the House but was never reported out by the Senate Finance Committee. However, testimony before the Committee reveals that the objections to the measure included the following (*see* Hearings on H.R. 3297 before the Senate Committee on Finance, 88th Cong., 2d

---

**19.** Internal Revenue Code of 1939, § 101(4)(C), as amended by Revenue Act of 1951, ch. 521, § 313(b), 65 Stat. 490, S.Rep.No. 781, 82d Cong., 1st Sess. 22–29, *reprinted in* [1951] U.S. Code Cong. & Ad.News 1969, 1991–97. And *see Maryland Savings-Share Ins. Corp. v. United States*, 308 F.Supp. 761, 769–70 (D.Md.), *rev'd*, 400 U.S. 4, 5, 91 S.Ct. 16, 17, 27 L.Ed.2d 4 (1970).

**20.** Internal Revenue Code of 1954, § 501(c)(14)(B), as amended by Act of April 22, 1960, Pub.L.No. 86–428, 74 Stat. 54. *See also* S.Rep.No. 1034, 86th Cong., 2d Sess. 3–4, *reprinted in* [1960] U.S.Code Cong. & Ad.News 1873, 1875 and *Maryland Savings-Share Ins. Corp. v. United States, supra.*

Sess. 6–10, 19, 30, 33, 34, 38–39 (1964); *United States v. Maryland Savings-Share Ins. Corp.*, 400 U.S. 4, 5–6, 91 S.Ct. 16, 17, 27 L.Ed.2d 4 (1970)):

(a) If MSSIC were granted the relief it sought, it would be difficult to deny it to other state-chartered private insurers of savings and loan associations. This in effect would recreate at least in part the discrimination in favor of such financial institutions which Congress thought it had eliminated in 1951. Savings and loan associations, like other financial institutions, were already entitled to set up tax free reserves from their earnings for losses on loans. To exempt insurers like MSSIC from tax on the earnings of their members' capital deposits would in effect provide a method whereby the associations could accumulate still more reserves free of tax.[21]

(b) Favorable income tax treatment would tend to encourage formation of private insurance corporations in other states with the attendant danger of competitive lowering of insurance standards from those established by the FSLIC for the institutions insured by it.

(c) The proliferation of state authorized but privately controlled insurers with tax exemption for their earnings could hinder the operations and threaten the financial stability of the FSLIC and the Federal Deposit Insurance Corporation and their members.

In 1976 during consideration of the 1976 tax reform bill (H.R. 10612, U.S.Code Cong. & Admin.News 1976, 2897), a provision was adopted on the Senate floor which would have extended the exemption to organizations created before January 1, 1969. (122 Cong.Rec. 26011.) This was intended to benefit MSSIC and a similar North Carolina chartered insurer. The measure was opposed by the Federal Home Loan Bank Board, which predicted the likelihood of proliferation of other state-chartered insurance organizations which would expect similar tax treatment. The board also called attention to the interdependence of financial institutions in the United States and the effect that the failure of one of these organizations would have on the savings and loan industry in general. The provision was deleted in the House-Senate conference on the bill. (*See* Hearings on H.R. 6989 before the Subcommittee on Miscellaneous Revenue Measures of House Ways and Means Committee, 95th Cong., 1st Sess. 121 (1978).)

In 1978 still another bill to exempt the reserves of MSSIC and the North Carolina insurer from income taxation was introduced in the House. It would have extended the cut-off date for exemption to January 1, 1969. (H.R. 6989, 95th Cong., 1st Sess.) The bill was opposed by the Treasury Department, which asked for repeal of section 501(c)(14)(B) of the Code entirely, on the ground that since the exemption for the savings and loan associations had been ended the exemption for their insurers' earnings should likewise be ended. The questions raised by the Federal Home Loan Bank Board in 1976 as to the desirability of encouraging the proliferation of state-sponsored insurance funds, and the possible adverse consequences of their failure on FSLIC members were reiterated at House hearings (*Id.* at 121, 125). No action was taken by the House on this bill. The same provision was then adopted as a Senate floor amendment to the Revenue Act of 1978, but it was deleted in conference. (124 Cong.Rec. 17557 (1978); H.Conf.Rep.No. 95–1800, 95th Cong., 2d Sess. 279, *reprinted in* [1978] U.S.Code Cong. & Ad.News 516).)

While it is true that in its unsuccessful legislative efforts MSSIC sought exemption from tax on its income and here plaintiff

---

21. *See, e. g.*, the following (Hearings at 19): "Senator Gore. Mr. Chairman, I would like to suggest that the witness has just made a very significant suggestion to the committee, that is, that other States are considering doing this same thing. In my opinion, if you open up this tax loophole permitting associations to hide away reserves with tax exemption, then we will not have just New York but perhaps all of the States coming in, and this may seriously weaken the Federal Savings and Loan Insurance Corporation and the regulatory activities of that corporation in the public interest."

seeks deductions from income for loss reserves, they are but different mechanics for achieving the same result. Under plaintiff's charter and bylaws, it is required to accumulate all of its earnings as reserves without distribution to its members. Thus, a deduction from plaintiff's income for an addition to its loss reserves (however designated) is the equivalent of exemption of such income from tax. It is extremely unlikely that plaintiff's income will exceed its need for reserves. For 1971 plaintiff's taxable income prior to the deduction was $70,-000, while in its tax return it claimed a bad debt deduction of $177,877, and in this suit it demands an insurance loss reserve deduction of up to $3 million. Moreover, as the members' deposits grow, the need for reserves will increase.[22] In the improbable event that its reserves became excessive, presumably plaintiff would reduce the deposits required thereafter.

Congress having considered and repeatedly failed to grant to plaintiff the equivalent of the relief it seeks here and the Supreme Court having held that there was a rational basis for such denial (*United States v.*

22. Dr. White testified that an $8–$9 million reserve would be needed by 1976.

*Maryland Savings-Share Ins. Corp., supra*), absent unambiguous general statutory provisions allowing plaintiff such relief, resolution of the conflicting conceptions of public policy inherent in determining the treatment of plaintiff's reserves should more appropriately be left to Congress rather than to the courts. *Cf. American Automobile Association v. United States*, 367 U.S. 687, 697, 81 S.Ct. 1727, 1732, 6 L.Ed.2d 1109 (1961).

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is therefore dismissed.

