**AMERICAN INTERNATIONAL GROUP, INC., and United Guaranty Corporation, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 93–467T, 94–390T.**

United States Court of Federal Claims.

July 3, 1997.

George R. Abramowitz, Washington, DC, for plaintiffs. Dennis L. Allen, of counsel.

David R. House, Department of Justice, with whom were Assistant Attorney General Loretta C. Argrett, and Chief, Court of Federal Claims Section Mildred L. Seidman, Washington, DC, for defendant. Thomas D. Sykes, Department of Justice, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action for refund of overpayment of taxes. It is brought by two holding companies that own corporations engaged primarily in the insurance and financial services business. The alleged overpayment resulted from the reduction by the Internal Revenue Service (IRS) of losses claimed by the plaintiffs. Trial was held in Washington, D.C. on April 9, 1997. For the reasons set out below, the court concludes that plaintiffs' calculations of losses were correct.

## BACKGROUND

The type of insurance involved in the transactions pertaining to this case was mortgage guaranty insurance. This insurance protects lenders against default by borrowers. It facilitates mortgage lending by reducing the lender's risk. With mortgage guaranty insurance, lenders are willing to agree to smaller down payments by borrowers. The question before the court is whether mortgage guaranty insurance companies can claim losses under § 832 of the Internal Revenue Code (IRC or "the Code") (codified, as amended, at 26 U.S.C. § 832 (1982)) for defaults by borrowers when title to collateral has not yet been acquired by the insured lenders.

A corporation that transacts mortgage guaranty insurance business is subject to the insurance laws and regulations of the state of its domicile as well as all other states in which it does business. In each state where an insurance company is authorized to transact insurance business, the company is required to file statements every year (Annual Statements) concerning its financial condition and the results of its operations on forms prescribed by the National Association of Insurance Commissioners (NAIC). The NAIC is made up of the principal insurance regulatory officials of the fifty states and the District of Columbia. The Annual Statements allow the NAIC to know the financial health of the insurance companies it regulates. Losses paid and those anticipated are very important factors in determining whether insurance companies are collecting sufficient revenue to cover their losses.

For all years relevant to this action, insurers were required by the NAIC, for purposes of completing the Annual Statement, to compute and maintain case basis and other loss reserves. A case basis reserve uses facts in each case which trigger coverage, as well as the company's experience with similar cases, in order to estimate a fair and reasonable amount the company can expect to pay out as losses. The loss reserves required by the NAIC were to accurately reflect loss frequency and loss severity and were to include components for claims reported and for claims incurred but not reported, including estimated losses on:

- Insured loans which resulted in the conveyance of property which remained unsold:
- Insured loans in the process of foreclosure; and
- Insured loans in default.

These reserves are used by insurers in later years to make payments on losses arising from defaulted loans. Although the losses represented by these reserves were un-

paid at the end of the year, insurers treated them as part of losses incurred for the year.

All three categories represent loans in default. The first category includes cases in which a payment has been made, but the insurer is not sure of the amount of the loss because proceeds from the sale of the property have not been taken into account. Defendant does not challenge claims of losses estimated from the first category. The dispute at bar concerns the last two categories of loss reserves because both deal with estimates of losses on loans for which title has not been acquired.

The insurance companies which are parties to this action are American International Group, Inc. (AIG)[1] and United Guaranty Corporation (UGC).[2] AIG acquired UGC in 1981. UGC owned United Guaranty Residential Insurance Company ("United Guaranty")[3] and United Guaranty Residential Insurance Company of North Carolina ("United Residential").[4] At all times relevant to this action, United Guaranty and United Residential were insurance companies taxable under IRC § 831, and each company was required to compute its taxable income under IRC § 832.

The plaintiff insurance companies generally issued policies on an annual basis, with annual premium payments. To a lesser extent, the insurers sold single premium policies that covered the lenders for a period of several years. The insurers earned the premiums under each policy as the period for which coverage was purchased lapsed (i.e., an annual premium was earned over the course of one year). A premium was not earned as of the time it was paid.

During the times relevant to this action, United Guaranty issued master policies to lending institutions for the coverage of first mortgages, and United Residential issued master policies to lending institutions for the coverage of second mortgages. Mortgage lenders were required to fill out standard application forms, which they submitted to United Guaranty or United Residential along with the borrower's loan application, credit reports. property appraisals, and other documents. For each application that qualified for insurance, the affected insurer issued a commitment. When the borrower closed the loan and the lender paid the required premium, the insurer issued the certificate of insurance evidencing coverage pursuant to the terms of the master policy.

The United Guaranty master policy stated that the insurer agreed to pay the insured "any loss sustained by reason of the *default* in payments by a Borrower as hereinafter set forth, subject to" certain conditions. (Emphasis added). The United Residential master policy stated the company's liability to insureds slightly differently but provided the same type of coverage. It stated that the insurer agreed to pay the insured, "benefits as herein set forth upon the *default* by a borrower in the payment of a loan insured hereunder subject to the terms and conditions of the Certificate issued with respect to such loan and to the terms of this Master Policy as follow." (Emphasis added). The lenders were thus being insured against losses from a borrower's default in payments.

1. AIG is incorporated in Delaware and is the common parent of a group of companies that files a consolidated income tax return. During the relevant dates of this action, AIG was a holding company that owned corporations engaged in the insurance and financial services business.

2. UGC is incorporated in North Carolina. During the relevant dates of this action, UGC was a holding company that owned corporations engaged in the insurance and financial services business.

3. United Guaranty is incorporated in North Carolina and is engaged in the business of writing mortgage guaranty insurance and reinsurance.

That business included the direct insurance coverage insuring, on an individual basis, loans secured by a first mortgage lien against real estate consisting of one-family and four-family dwellings and the reinsurance of business written by other mortgage guaranty insurers.

4. United Residential is incorporated in North Carolina and is engaged in the business of writing mortgage guaranty insurance and credit insurance on a direct and reinsurance basis. Coverage written by United Residential included "real estate equity loan" insurance and reinsurance under which United Residential covered loans secured by a second mortgage lien against real estate consisting of one-family and four-family dwellings.

To keep track of loans in default, the insurance policies required the lender to provide the insurer with notice no later than ten days after a borrower was in default on a certain number of payments. For United Guaranty policies, four months of default in payments triggered the notice requirement. For United Residential policies, two months of default in payments prompted notice. After notice was given, the lender was obligated to file monthly reports with the insurer apprising it of the status of the account and any subsequent action taken by the lender, such as foreclosure proceedings. Based on these reports, both insurers assigned loans to one of the following four default categories:

Category (1) *Delinquency.* Loans for which United Guaranty or United Residential had received a notice from the lender and which did not fit into one of the other categories of loans in default.

Category (2) *Pending foreclosure.* Loans for which the lender was prepared to start foreclosure proceedings.

Category (3) *In foreclosure.* Loans for which the lender had commenced foreclosure proceedings.

Category (4) *Claims filed / not paid.* Loans for which the lender had completed foreclosure and had filed a claim with United Guaranty or United Residential.

United Guaranty also used a fifth category:

Category (5) *Real estate* owned. If United Guaranty acquired title to the mortgaged property associated with the loan, the loan was assigned to this category.

It is to be noted, therefore, that the insurance companies treated certain loans as in default even though claims had not yet been made.

In the event default resulted in a payment by plaintiffs, that amount was calculated by totaling the following: the unpaid principal balance due under the mortgage loan agreement; accumulated interest: real estate taxes and hazard insurance premiums; reasonable and necessary expenses incurred by the lender in the preservation of the mortgage property, not to exceed a specific amount; and all reasonable and necessary expenses of appropriate proceedings, including court costs and reasonable attorney's fees. Because United Residential dealt with second mortgages, it also paid any cost incurred by the lender in curing a delinquency on the first mortgage instrument at United Residential's direction. The resulting total became the settlement amount.

Either insurer could elect to settle a claim by accepting title to the property and paying the settlement amount. Both could also elect an alternative means: paying the lender a percentage of the settlement amount and allowing the lender to keep title to the property. A majority of claims were settled by this alternate means.

With some exceptions noted below, both insurers required the lender to foreclose and tender merchantable title to the mortgaged property to make a claim. United Guaranty required the property to be free and clear of all encumbrances before the lender could make a claim, while United Residential required the property to be free and clear of all encumbrances except the permitted first lien.

In some instances during this period, United Guaranty and United Residential approved claims in which the lender did not first take title to the property. Typically, in those cases, an insured loan was in default and a sale for cash of the underlying real estate was anticipated to produce a deficit. The borrower was allowed to sell the subject property to a third party prior to foreclosure of the loan. This process required prior approval by the insurer. Because United Residential dealt with second mortgages, there were times when all of the proceeds from the sale of the foreclosed property were used to cover losses of the lender on the first mortgage or its insurer. There would then be no value in the property to which United Residential's insured lender could claim ownership. In those circumstances, the lender on the second mortgage could request prior approval from United Residential to file a claim without taking title to the subject property. Even if the request was approved, the lender could not file a claim until the first mortgagee completed foreclosure on the subject property.

The insurers approved valid claims as long as coverage was in effect at the time default

occurred. Coverage with respect to the defaulted loan did not, however, have to be in effect at the time notice was received, foreclosure proceedings were instituted, title was transferred from the borrower, or a claim was filed. A lender could cancel coverage for a loan following a borrower default, receive a premium refund, and its claim still would be approved so long as the default event occurred during a time covered by the policy premium.

At all times relevant to this action, the insurers reported to the NAIC, as losses, a portion of loans which were in default but as to which claims had not yet been made. These losses were reflected in the "Underwriting and Investment Exhibit," which was part of the NAIC Annual Statement that United Guaranty and United Residential were required to submit. This form called for the following computation for losses incurred, including estimates of unpaid losses:

> (a) To losses paid during the year, add reinsurance assumed, and subtract reinsurance recovered;

> (b) To the result so obtained, add net unpaid losses outstanding at the end of the current year, and subtract net unpaid losses outstanding at the end of the preceding year.

In reflecting outstanding "net unpaid losses," the NAIC Annual Statement required that the insurance companies include an estimate of losses on loans for which the lender had not gained title but which were in default, i.e., the second and third reserve categories listed above.

To estimate losses from loans that merely were in default, United Guaranty multiplied the potential exposure for loans in default categories (1) through (3) by a "loss factor." The loss factor was the product of multiplying a "probability of loss" factor by a "loss-to-exposure" factor. The probability of loss factor was determined by finding the probability that loans in a particular category would result in a loss. The loss-to-exposure factor was determined by comparing United Guaranty's actual historical loss payments from delinquent loans to United Guaranty's loss exposure for such loans. United Guaranty reviewed each claim filed for a category

(4) loan. It made an estimate of its unpaid losses with respect to that category of loans taking into account such information as the claim amount and the offsetting appraised value of the underlying mortgaged property. For category (5) loans, United Guaranty's estimate of unpaid losses was based on the purchase price of the subject mortgaged property less the estimated realizable value of the property.

United Residential multiplied exposure for loans in category (1) by a loss factor drawn from using United Guaranty's historical data. For each loan reported in categories (2) through (4), United Residential made an estimate of its unpaid losses taking into account such information as the claim amount, the offsetting appraised value of the property, and the first mortgage loan balance including amounts past due.

The Annual Statements were not the only documents on which the insurance companies reported losses. They also reported losses on their tax returns. For the years in issue, United Guaranty and United Residential were required to compute their deductions for "losses incurred" under IRC § 832(b)(5). United Guaranty and United Residential used the same method to compute losses on both the NAIC Annual Statement and the tax return filed by their company. Therein arises the present controversy.

In connection with the audit of AIG's 1983 consolidated federal income tax return, the IRS differentiated between calculations of losses for accounting purposes and for tax purposes. It disallowed losses taken in 1983 in those instances in which the lenders had not gained title to the property. The IRS reduced United Guaranty's losses incurred by $8,386,790 and United Residential's losses incurred by $880,481. As a result of the reductions in losses incurred for 1983, items carried back to prior years also were affected. This in turn increased taxes for AIG and UGC for tax years 1978 and 1981.

On January 21, 1993, AIG and UGC timely filed Forms 1120X for refunds for 1978 and 1981 in the following amounts:

| Plaintiff | Year | Tax | Interest | Total |
|---|---|---|---|---|
| AIG | 1978 | $3,798,913.00 | $4,872,126.73 | $8,671,039.73 |
| AIG | 1981 | 60,702.00 | 96,641.60 | 157,343.60 |
| UGC | 1978 | 75,064.00 | 86,797.48 | 161,861.48 |
| UGC | 1981 | 12,516.00 | 14,472.39 | 26.988.39 |

On July 28, 1993, AIG and UGC filed their complaint here seeking refunds for AIG's tax year 1978 and UGC's tax year 1978 and 1981. On June 14,1994, AIG filed a separate complaint in this court claiming a refund for tax year 1981. The cases were consolidated. Each of the taxable years stated is a calendar year except for UGC's 1981 taxable year, which begins January 1, 1981, and ends September 30, 1981.

## DISCUSSION

The relevant portions of IRC § 832 for the years in question are as follows:

(a) *Definition of taxable income.*

In the case of an insurance company subject to the tax imposed by section 831, the term "taxable income" means the gross income as defined in subsection (b)(1) less the deductions allowed by subsection (c).

(b) *Definitions.*—In the case of an insurance company subject to tax imposed by section 831—

(1) *Gross income.*—The term "gross income" means the sum of—

(A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners.

. . . .

(E) in the case of a company which writes mortgage guaranty insurance, the amount required by subsection (e)(5) to be subtracted from the mortgage guaranty account.

. . . .

(3) *Underwriting income.*—The term "underwriting income" means the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred.

. . . .

(5) *Losses incurred.*—The term "losses incurred" means losses incurred during the taxable year on insurance contracts computed as follows:

(A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

The Annual Statement of the NAIC, pursuant to which plaintiffs calculated their losses, is thus specifically incorporated into the applicable code provision in terms of the definition of gross income. The question presented is whether, in defining gross income, § 832 also incorporates other elements of the NAIC Annual Statement, specifically, the way in which loans in default for which the lender had not yet acquired title are treated as current-year losses.

Defendant has two types of arguments—those drawn from an analysis of § 832 and those based on the insurance policies themselves. As to the former, it contends that the Code section only incorporates other portions of the NAIC Annual Statement, not the components reflecting reserve losses for loans in default. As to its construction of the policies, the defendant argues that no loss arises within the meaning of mortgage insurance until the insured has suffered a loss as defined by the terms of the insurance policy. Because the policies do not require the insurers to make any payment until the lender has acquired title, defendant chooses that as the point at which payment is certain enough to justify claiming a loss from the loans.

The insuring corporations, on the other hand, argue that the NAIC Annual Statements require that losses from defaults be estimated and attributed to the year in which the default occurred, irrespective of whether title has been acquired or payment made. The Annual Statements are expressly linked to IRC § 832, the argument goes, and therefore, estimates from defaults must be includ-

ed in outstanding losses for income tax purposes. In addition, plaintiffs contend that this approach reflects the principle of "matching" premiums with corresponding losses, which is discussed below.

The beginning point for resolving the dispute is IRC § 832. Defendant points out that there is no explicit mention in § 832(b)(5), "losses incurred," of the NAIC Annual Statement. A reading of § 832 as a whole, however, supports plaintiffs' construction, which is that the incorporation of the NAIC forms at § 832(b)(1), "gross income," brings with it the constituent elements of income, including losses.

■ The Code defines gross income on the basis of the underwriting and investment exhibit of the Annual Statement approved by the NAIC. IRC § 832(b)(1)(A). Underwriting income, in turn, is calculated in part, based on premiums less "losses incurred." IRC § 832(b)(3). This parallels the NAIC Annual Statement which also calculates underwriting income as a function of premiums less losses incurred. The NAIC then directs companies in the plaintiffs' position to reflect losses incurred in the same way plaintiffs did on their collective tax return; namely, by basing them on loans reported as delinquent. If the Government's method were used to calculate "losses incurred" under IRC § 832(b)(5), a different amount than that reflected on plaintiffs' Annual Statements would appear as "underwriting income" under IRC § 832(b)(3). That different amount would then be used to determine "gross income," leading, therefore, to a different amount than that reflected on the Annual Statements. In other words, the Code's direction at § 832(b)(1), that plaintiffs compute gross income on the basis of the Annual Statement, is an implied direction that the components of gross income, including losses incurred, also be drawn from the NAIC Annual Statement.

Another federal court has addressed this issue. The facts in *Sears, Roebuck & Co. v. Commissioner,* 972 F.2d 858 (7th Cir.1992), *rev'g* 96 T.C. 61, 1991 WL 4979 (1991), are similar. In that case, mortgage lenders were required to tender title before payment for loss could proceed. The insurers, as did the plaintiffs here, claimed losses based on estimates of policies in default, even though the lenders had not yet obtained title. The estimates were based on historical data. *Sears, Roebuck & Co. v. Commissioner,* 96 T.C. 61, 80–81, 1991 WL 4979 (1991), *rev'd,* 972 F.2d 858 (7th Cir.1992). The Tax Court held that mortgage insurers could not claim such losses on their tax returns. *Id.* at 114.

The United States Court of Appeals for the Seventh Circuit reversed. *Sears,* 972 F.2d at 868. The court held that the Code expressly links federal taxes to the NAIC's Annual Statement requirements. *Id.* at 866. The court stated it was "scarcely possible" to use the Annual Statement to determine income and yet not use the Annual Statement to determine losses. *Id.* As it pointed out in response to an argument similar to one made by the defendant in this case, "[s]tate insurance commissioners' preferences about reserves thus are not some intrusion on federal tax policy; using their annual statement is federal tax law." *Id.*

The circuit court in *Sears* also found justification for using default events to trigger losses because the insurers could not escape exposure to liability once default took place. "[T]he acid test is whether the default leaves the insurer responsible for payment." *Id.* at 867. The court drew from the example of malpractice insurance to illustrate the point. Malpractice insurance companies are liable for losses when the event occurs that triggers the coverage, not when the amount of the loss is quantified. Similarly, in the case of a borrower default in a mortgage insurance policy, the court reasoned that "actual unpaid losses" do not have to be quantified or immediately payable. The court embraced the logic of setting aside reserves which can be predicted from default events which take place in the taxable year.

The court also pointed out that the Code treats insurance companies differently than other taxpayers. *Id.* When calculating losses under IRC § 832(b)(5), insurers are not held to the same standards as accrual-basis taxpayers. *See United States v. General Dynamics Corp.,* 481 U.S. 239, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987). To force insurers to wait for quantification would, in effect, inap-

propriately place insurers in the same category with other taxpayers. *Sears*, 972 F.2d at 867.

Defendant asks this court not to follow the circuit court's opinion in *Sears*. It argues that the NAIC standards should be viewed merely as a starting point from which to determine taxes for insurance companies. Specifically, it contends that the NAIC standards are not controlling when they conflict with the requirements of the Code, citing *Home Group, Inc. v. Commissioner*, 875 F.2d 377, 381 (2d Cir.1989), *cert. denied sub nom., AmBase Corp. v. Commissioner*, 493 U.S. 1069, 110 S.Ct. 1111, 107 L.Ed.2d 1019 (1990);[5] and *Western Cas. & Sur. Co. v. Commissioner*, 571 F.2d 514, 517 (10th Cir. 1978). The principal problem with this argument is that there is only a conflict between the NAIC and the Code if the latter is construed as the Government wishes. As explained above, the court is persuaded that there is no such conflict. In any event, the cases cited by the defendant are distinguishable.

*Home Group* and *Western* involved "expenses incurred," which are governed by IRC § 832(b)(6), rather than "losses incurred," which are governed by § 832(b)(5). The former subsection provides:

(6) *Expenses incurred.*—The term "expenses incurred" means all expenses shown on the annual statement approved by the National Association of Insurance Commissioners, and shall be computed as follows: To all expenses paid during the taxable year, add expenses unpaid at the end of the taxable year and deduct expenses unpaid at the end of the preceding taxable year. For the purpose of computing the taxable income subject to the tax imposed by section 831, there shall be deducted from expenses incurred (as defined in this paragraph) all expenses incurred which are not allowed as deductions by subsection (c).

IRC § 832(b)(6). The taxpayer thus starts with expenses as defined by the NAIC. The last sentence, however, puts a condition on a mechanical application of the NAIC standards. It requires the deduction of any expenses that are not allowed by subsection (c). Subsection (c), in turn, does not allow any expenses that are not allowed by IRC § 162. Section 162 is the general provision for determining expenses for businesses. It lists several items that do not qualify as expenses. Subsection (b)(5) has no parallel limitation.[6]

Defendant argues, nevertheless, that § 832 should be interpreted in light of Treasury Regulation § 1.832–4(a)(5), which provides that "the determination of unpaid losses at the close of each year must represent *actual unpaid losses*." (Emphasis added.) Defendant argues that to be an actual unpaid loss, at the very least, the lender must take title. It points to similar language in Treasury Regulation § 1.832–4(b):

(b) Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only *actual unpaid losses* stated in amounts which, based upon the facts in each case and the company's experience with similar cases, can be said to represent a fair and reasonable estimate of the

---

5. *Home Group* also discussed actions that resulted in a "mismatching" of funds. *Home Group*, 875 F.2d at 379. In that case, the insurance company had included in expenses for the year the policy was sold, commissions to agents which were not paid until subsequent years. At the same time, the insurance company did not include premiums in its calculations of income until the premiums were paid. The court held that expenses associated with the commissions had to be included in the years the commissions were paid, not the year the policy was sold. In its decision, the court acknowledged the concept of "matching" income and expenses. *Home Group*, 875 F.2d at 381.

6. *Hanover Ins. Co. v. Commissioner*, 598 F.2d 1211, 1217 (1st Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979), is also distinguishable. The court there held that NAIC accounting methods are preferences that "should not be interpreted to inhibit the Commissioner's authority to enforce I.R.C. § 832." *Hanover* stands for the proposition that the Commissioner is able to check the calculations on the Annual Statements to determine if they are fair or reasonable. In this case, defendant has stipulated that plaintiffs' estimates were reasonable.

amount the company will be required to pay.

Treas. Reg. § 1.832–4(b). (Emphasis added.)

Defendant calls attention to the highlighted words, but overlooks the balance of the language. The complete phrase in subsection (a)(5) is "actual unpaid losses as nearly as it is possible to ascertain them" Treas. Reg. § 1.832–4(a)(5). The same acknowledgment of the need to estimate is contained in the language quoted above from subsection (4)(b): "a fair and reasonable estimate of the amount the company will be required to pay." Estimation, by its very nature, implies that the precise amount of a particular loss is uncertain. What is being estimated is the actual loss incurred, even though it is not yet a definite amount. Treasury Regulation § 1.832–4(b) specifically provides that the estimate can be based on experience with similar cases. That is precisely what United Guaranty and United Residential did here. They did not claim the maximum amount for which they were potentially liable on every loan that was in default. For some categories of default, the insurance companies estimated the amount of defaults that would ultimately become losses based on data from United Guaranty's experience with similar cases. For other cases of default, the companies considered the factors of each individual case and determined the likelihood of loss. The regulation, in short, is consistent with plaintiffs' approach.

Defendant contends, however, that an examination of the relevant insurance policies leads to a different understanding of, or context for, the "estimation" contemplated by the regulations. It points out that the lender normally must acquire title before a loss can be claimed. There are times, however, when the lender does have title but does not immediately report a loss to the insurer. This is known as an incurred but not reported (IBNR) loss. It is only at these times, defendant contends, that estimating losses is appropriate.

In the court's view, defendant admits too much. In an effort to avoid an unfavorable interpretation of the regulations, defendant demonstrates that its more general argument—that losses cannot be claimed until title is tendered because the policies require tender before a claim can be paid—is not a principled one. The same section which requires tender of title also provides that claims are payable within sixty days after a claim is filed. Failure to file a claim for a loss within sixty days of conveyance of title to the insured can be deemed a waiver of any right to payment. Filing a claim is thus a prerequisite for the insurer to make a payment. In short, defendant's willingness to permit deduction of estimated IBNR losses is a concession that each condition in the policies for paying a loss does not have to be met for a loss to be estimated for tax purposes.[7] There is no reason offered, however, as to why estimating should be limited to this one circumstance.

Defendant also cites *Maryland Savings–Share Ins. Corp. v. United States,* 226 Ct.Cl. 487, 644 F.2d 16 (1981). In that case, a nonprofit state deposit insurance corporation sought to justify a tax deduction for additions to a reserve for IBNR losses. The reserves were to cover policies that guaranteed deposits in savings and loan institutions. The insurer claimed that the failure of financial institutions could be traced to "bad acts," such as incompetent management, bad loans, or malfeasance. The insurer's expert then determined that the average lag time between a bad event and a loss was ten years. He then calculated that a $2 million reserve in 1971 would create a 3.5% risk that the insurer would fail over a ten year period, while a $3 million reserve would only create a 2% risk. Deciding that 2% was an acceptable risk, the expert determined that $3 million should have been the loss reserves allowed for the insurer. *Maryland Savings–Share,* 644 F.2d at 25, 26. The court ultimately rejected the claimed deduction for IBNR loss reserves because the insurer could not show that individual "bad acts"

---

7. For tax purposes, there is no difference between an IBNR loss and an event which triggers coverage although the amount of loss has not been determined. Neither event causes pay-

ments for losses within the taxable year, and yet both events fix liability in the insurer or losses associated with premiums paid for coverage in that year.

caused losses, particularly if the loss deduction was claimed after coverage had lapsed. *Id.* at 28.

Another case, *State of Maryland Deposit Ins. Fund Corp. v. Commissioner*, 88 T.C. 1050, 1987 WL 39960 (1987), dealt with the successor corporation to the insurer in *Maryland Savings–Share*. The insurer argued that catastrophic losses and a different expert witness differentiated the claim from the previous one. The Tax Court rejected the argument that bad acts made the insurer liable for losses incurred. "Acts such as mismanagement, issuance of bad loans, and embezzlement ... do not constitute events of default under MSSIC's by laws, nor do they necessarily result in actual insurance-related loses for MSSIC." *Maryland Deposit*, 88 T.C. at 1061.

In the *Maryland* cases, the Tax Court and the Court of Claims looked to the corporate bylaws to determine what the policy term "event of default" meant. The default events were defined as either an adjudication in bankruptcy, the appointment of a conservator, or the appointment of a receiver for the insured's affairs. *Maryland Savings–Share*, 644 F.2d at 28; *Maryland Deposit*, 88 T.C. at 1055. Because these events were not the basis for the loss reserves in the *Maryland* cases, coverage was not triggered and no loss could be claimed. In other words, the "bad acts" from which the insurers in the *Maryland* cases estimated losses were not sufficient, by themselves, to prompt liability. The bad acts had to lead to a particular loss during the coverage period. If an insured had a loss in a year after coverage had lapsed, it was not sufficient to point to a bad act during a covered year. "[E]ven if an embezzlement takes place or one or a series of bad loans is made by a member during a particular year, plaintiff incurs no liability unless such occurrence leads to an event of default during the same period." *Maryland Savings–Share*, 644 F.2d at 28.

The same cannot be said about the present case. The default events plaintiffs used to estimate losses in the present case were the events that triggered liability coverage under the policies, even if the losses were not manifested until years following the event.

Finally, the court notes that there is a rationale in accounting practice for interpreting § 832 as plaintiffs do. Ms. Ruth E. Salzmann testified for plaintiff as an expert on the general accounting practices of insurance companies. She explained that the NAIC Annual Statement, insofar as it relates to calculating losses, incorporates the principle that premiums paid in a given year should be "matched" with losses incurred for the same year. This means that if coverage is triggered while the insurance policy is in force, the resulting loss costs must be reflected in the insurer's Annual Statement for the accounting period in which the specified event takes place. This is true even if the default event has not been reported or the loss from the event has not been determined.

## CONCLUSION

 United Guaranty and United Residential correctly resorted to NAIC standards for calculating the losses reflected in AIG's 1983 tax return. It follows that the IRS improperly reduced AIG's loss deductions in 1983, thereby causing an overpayment of taxes for 1978 and 1981. The parties are directed to calculate the amount of the judgment and report back to the court by July 22, 1997.