## State Farm Mutual Automobile Insurance Company & Subsidiaries, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 5426–05.          Filed November 8, 2010.

P provided automobile liability insurance. P was found by the Supreme Court of Utah to be liable for punitive damages related to its claims processing on this liability coverage. P reflected the amount of the punitive damage award as a "loss incurred" within the meaning of sec. 832(b)(5), I.R.C., entitling it to increase its insurance loss reserve, as shown on its annual statement for insurance regulatory purposes. R challenges this treatment for several reasons including that the punitive damage award was extracontractual to the insurance coverage P provided. *Held*: P may not include the punitive damage award in losses incurred under sec. 832(b)(5), I.R.C.

*Jerome B. Libin*, *James V. Heffernan*, *Mary E. Monahan*, and *Troy L. Olsen*, for petitioner.

*Alan M. Jacobson*, *Jan E. Lamartine*, and *William F. Barry IV*, for respondent.

### OPINION

GOEKE, *Judge*: Respondent determined deficiencies in petitioner's income tax for the taxable years 1996 through 1999. Petitioner raised seven issues in its petition, six of which have been resolved. This Opinion addresses solely whether punitive damages and related costs of $202 million are includable in losses incurred under section 832(b)(5)[1] for taxable years 2001 and 2002. For the reasons stated herein, we find that the $202 million is not properly included in losses incurred for Federal income tax purposes.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## *Background*

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Petitioner is an Illinois mutual property and casualty insurance company taxed as a corporation. Its principal office is in Bloomington, Illinois.

### A. *The Accident Case, Campbell I, and Campbell II* [2]

Petitioner issued an automobile insurance contract to Curtis B. Campbell (Campbell) effective August 8, 1980 (the Campbell contract). Campbell was a resident of Utah. Under the Campbell contract, petitioner provided Campbell with automobile insurance coverage. The bodily injury coverage under the Campbell contract was limited to $25,000 for each person and $50,000 for each accident.

The Campbell contract was in force on May 22, 1981. On that date an automobile accident (the accident) occurred in Utah involving Todd Ospital and Robert Slusher (Slusher) which resulted in the death of Todd Ospital and serious injury to Slusher. The manner in which Campbell was driving was alleged to have caused the accident. Litigation ensued (the accident case).

In 1983 a Utah State court determined that Campbell was responsible for the accident and entered a judgment of $185,849 against him. That amount exceeded the per-accident limit of $50,000 under Campbell's insurance policy. Petitioner appealed the judgment on behalf of Campbell to the Utah Supreme Court. Campbell obtained his own counsel for the appeal.

In 1984 during the pendency of the appeal in the accident case, Ospital's estate (Ospital), Slusher, and Campbell reached an agreement whereby Ospital and Slusher would not seek satisfaction of their claims against Campbell, and in exchange Campbell would (a) pursue an action asserting bad faith against petitioner, (b) be represented by Slusher's and Ospital's attorneys in that action, and (c) pay Ospital and

---

[2] The background of the accident case and the Campbell cases against petitioner for bad faith is set forth in various opinions: *Slusher v. Ospital*, 777 P.2d 437 (Utah 1989); *Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130 (Utah Ct. App. 1992); and *Campbell v. State Farm Mut. Auto. Ins. Co.*, 65 P.3d 1134 (Utah 2001), revd. 538 U.S. 408 (2003), on remand 98 P.3d 409 (Utah 2004).

Slusher 90 percent of any damage award resulting from that action.

Campbell filed a complaint against petitioner in Utah State court (Campbell I) in an action separate from but related to the accident case. Ospital and Slusher joined in Campbell's complaint. The complaint in Campbell I alleged bad faith on the part of petitioner in its conduct with respect to the accident case. Petitioner successfully moved to have the complaint dismissed, offering to pay the entire judgment against Campbell if the accident case was upheld on appeal.

In June 1989 the Utah Supreme Court affirmed the lower State court's judgment in the accident case in favor of Ospital and Slusher. Petitioner paid $314,768 to Ospital and Slusher. These payments satisfied the judgment, including interest and costs.

In August 1989 Campbell filed a second complaint against petitioner in Utah State court (Campbell II). The complaint alleged five causes of action: (a) Breach of covenant of good faith and fair dealing; (b) tort of bad faith; (c) breach of fiduciary duty; (d) misrepresentation; and (e) intentional infliction of emotional distress. In February 1991 the State court in Campbell II granted petitioner's motion for summary judgment, finding that petitioner had promptly satisfied the entire judgment in the accident case when it became final.

In August 1992 the Utah Court of Appeals reversed the trial court's grant of summary judgment to petitioner in Campbell II and remanded the case for trial. In August 1996 the jury in Campbell II awarded Campbell $2.6 million in compensatory damages and $145 million in punitive damages against petitioner, plus attorney's fees and costs. Petitioner challenged the award, and in August 1998 the trial court reduced Campbell's award to $1 million in compensatory damages and $25 million in punitive damages. Both parties appealed.

In October 2001 the Utah Supreme Court reinstated the $145 million punitive damages award and affirmed the $1 million compensatory damage award against petitioner. On December 4, 2001, the Utah Supreme Court denied petitioner's request for rehearing.

In March 2002 petitioner filed a petition with the U.S. Supreme Court for a writ of certiorari seeking review of the 2001 Campbell II decision. In June 2002 the Supreme Court

granted certiorari. On April 7, 2003, the Supreme Court reversed the 2001 Campbell II decision and remanded the case to the Utah Supreme Court for a redetermination of the punitive damages.

In April 2004 the Utah Supreme Court held that petitioner was liable to Campbell in the amount of $9,018,781 in punitive damages. From May 2003 to August 2005, petitioner paid a total of $16,927,635 to or for the behalf of Campbell, as follows:

| | |
|---|---:|
| May 8, 2003 ....................................................................... | $2,642,348 |
| Oct. 15, 2004 ..................................................................... | 14,195,287 |
| Aug. 26, 2005 .................................................................... | 90,000 |

These payments fully satisfied the Campbell II judgment, including interest and costs.

## B. *Statutory Accounting for Illinois Insurance Companies*

Petitioner is required to file an annual financial statement (annual statement) with the State of Illinois, petitioner's State of domicile. The annual statement is a form by which insurance companies report to the State their financial condition and historical information about their results.

Petitioner filed Annual Statements for 2001 and 2002 with both the State of Illinois and the National Association of Insurance Commissioners (NAIC). The NAIC is an organization of State insurance regulators for all 50 States, the District of Columbia, and five U.S. territories. Other jurisdictions in which petitioner does business have access to and review the filings it makes with the NAIC.

NAIC statutory accounting practices and procedures are set forth in the NAIC Accounting Practices and Procedures Manual. In 1998 the NAIC adopted a new Accounting Practices and Procedures Manual (the new AP&P Manual). The NAIC recommended that States adopt the new AP&P Manual effective January 1, 2001. In December 2000 the Illinois Department of Insurance decided that, effective January 1, 2001, the new AP&P Manual was to be used as the reporting standard for statutory financial statements filed in Illinois. Beginning with the March 31, 2001, quarterly financial statements, all insurance companies domiciled in the State of Illinois were required to follow the accounting practices and procedures set forth in the new AP&P Manual. The State of

Illinois also requires insurance companies domiciled in Illinois to follow the NAIC's instructions for filling out Annual Statements.

Statutory Accounting Principles (SAPs) provide the basis for insurers to prepare financial statements to be filed with and used by State insurance departments for financial regulation purposes. The promulgation of new SAP guidance by the NAIC ultimately requires action of the entire membership. Responsibility for proposing a new SAP is delegated through the NAIC committee structure to the Accounting Practices and Procedures Task Force (the task force). The task force employs two working groups with distinctly different functions to carry out the charge of maintaining SAPs.

The Statutory Accounting Principles Working Group (SAPWG) has the exclusive responsibility for developing and proposing new Statements of Statutory Accounting Principles (SSAPs). SSAPs are pronouncements of accounting rules adopted by the NAIC. SSAPs are included in the new AP&P Manual.

The Emerging Accounting Issues Working Group (EAIWG) responds to questions of application, interpretation, and clarification of SSAPs. Its work is generally much narrower in scope than development of a new SSAP. In no event shall a consensus opinion of the EAIWG amend, supersede, or otherwise conflict with existing, effective SSAPs. The consensus opinions of the EAIWG are called Interpretations (INTs).

## C. *Petitioner's Loss Reserve Accounting*

By statute Illinois requires property and casualty insurance companies at all times to maintain reserves in amounts estimated to provide for the payment of all losses and claims incurred, whether reported or unreported, which are unpaid and for which such companies may be liable, and to provide for the expenses of adjustment or settlement of such losses and claims. Petitioner's personnel in the field generally establish reserves relating to specific coverages or claims under company contracts. Those reserves are aggregated and processed for reporting on petitioner's Annual Statements. Petitioner's reserve includes a bulk loss reserve amount established for certain reported claims to reflect the difference between aggregate case or table reserves for such

claims and the aggregate anticipated ultimate settlement amount of such claims.

Petitioner reported its reserves for unpaid losses in its 2001 and 2002 Annual Statements. In determining its year-end unpaid loss reserve for 2001, petitioner increased its Bulk and Incurred But Not Reported (Bulk and IBNR) unpaid loss reserve by $202 million. This increase was attributable to the 2001 Campbell II decision and the denial by the Utah Supreme Court of petitioner's request for rehearing in December 2001 and was composed of the following amounts:

| | |
|---|---:|
| Compensatory damages | $1,000,000 |
| Punitive damages | 145,000,000 |
| Plaintiff's court costs | 400,000 |
| Plaintiff's attorney's fees | 400,000 |
| Interest | 55,200,000 |
| Total | 202,000,000 |

Petitioner applied a 2001 discount factor of 92.8052 percent to the $202 million, as required by sections 832(b)(5)(A) and 846(d), and deducted the resulting $187,466,504 from its 2001 taxable income.

In determining its yearend unpaid loss reserve for the 2002 Annual Statement, petitioner made no change in its Bulk and IBNR unpaid loss reserve with respect to the $202 million reserved for the 2001 Campbell II decision. Petitioner applied a 2002 discount factor of 94.3541 percent to the $202 million, then subtracted the 2001 discounted amount ($187,466,504) from the 2002 discounted amount ($190,595,282), resulting in an increase in the loss reserve of $3,128,778. Petitioner deducted the $3,128,778 from its 2002 taxable income.

Following the 2003 Supreme Court decision reversing the 2001 Campbell II decision, and before the 2004 Campbell II decision by the Utah Supreme Court, petitioner reduced its yearend 2003 Annual Statement Bulk and IBNR reserve for unpaid losses by $192 million. Petitioner retained $10 million attributable to Campbell II. Applying the 2003 discount factor of 89.301 percent to the remaining $10 million, then subtracting the resulting amount ($8,930,100) from the 2002 discounted amount of $190,595,282, petitioner determined that the loss reserve should be decreased by $181,665,182. Petitioner increased its 2003 taxable income by $181,665,182.

Petitioner coded the Campbell II reserve on its records as relating to bodily injury coverage for the accident year 1981 in the State of Utah. This coding was the same as the coding used for the accident itself.

As required by the NAIC and by Illinois State law, petitioner's 2001 and 2002 reported reserves were reviewed for adequacy by its outside auditors, PricewaterhouseCoopers (PwC). During the review, PwC was aware that petitioner had included the $202 million Campbell II judgment in its loss reserves. For both 2001 and 2002, PwC prepared and filed with the State of Illinois actuarial reports on petitioner's loss and loss reserves. PwC's reports set forth its opinion that petitioner's reserves: (1) Met the requirements of Illinois insurance laws; (2) were computed in accordance with generally accepted reserve standards and principles; and (3) made a reasonable provision for all unpaid loss and loss adjustment expense obligations of petitioner under the terms of its policies and agreements. These reports also set forth PwC's unqualified opinion that petitioner had prepared its 2001 and 2002 Annual Statements "using accounting practices prescribed or permitted by the Insurance Department of the State of Illinois." These reports included the loss reserve amounts relating to Campbell II but did not refer to Campbell II directly.

Petitioner's 2001 and 2002 Annual Statements were also examined by a multistate team of insurance examiners (the examination team) under the auspices of the director of the Illinois Department of Insurance. Such examinations were required by State law and conducted primarily to ensure the solvency of insurance companies. The examination team was aware of Campbell II and of the fact that the $202 million had been included in petitioner's loss reserve. On July 26, 2002, during its examination of petitioner's 2001 Annual Statement, the Examination Team requested more information regarding the $202 million unpaid loss reserve. Petitioner responded on July 30, 2002, that it had made a special adjustment in the reserve for *Campbell v. State Farm Mut. Auto Ins. Co*, 65 P.3d 1134 (Utah 2001). Petitioner further stated:

The $202 million reserve adjustment represents the court award and estimated interest. The award was reduced by the Utah appellate court, but

reinstated by the Utah Supreme Court in 2001. At year end, we thought there was little chance that the US Supreme Court would agree to hear the case, but they recently did.

The Examination Team issued a report after examining both Annual Statements. These reports referred to the loss reserve amounts relating to Campbell II but did not refer to Campbell II directly. The director of the Illinois Department of Insurance adopted each of these reports.

Although petitioner's accounting affected the allocation to the loss reserve, petitioner did not consider the amounts relating to the Campbell II case in petitioner's ratemaking calculations.

Respondent audited petitioner's returns for taxable years 1996 through 1999 and issued a notice of deficiency with respect to those years on December 22, 2004. Respondent determined deficiencies in petitioner's Federal income taxes of $12,830,522, $55,903,247, $25,981,117, and $14,249,973 for 1996, 1997, 1998, and 1999, respectively. In the notice of deficiency respondent disallowed the deductions petitioner claimed as a result of the adjustments made to the Bulk and IBNR reserve for unpaid losses in 2001 and 2002 attributable to the judgment of the Utah Supreme Court in Campbell II.

Petitioner timely filed its petition with this Court on March 21, 2005, disputing a portion of the deficiency determined for 1996 and disputing the entire deficiency determined for each of 1997, 1998, and 1999. In addition, petitioner claimed overpayments of $156,917,448, $214,471,611, and $138,570,516 for 1997, 1998, and 1999, respectively, due to alternative minimum tax (AMT) net operating loss carrybacks from the taxable years 2001 and 2002. Respondent timely filed his answer on May 19, 2005, reasserting the deficiencies and denying that petitioner had made any overpayments.

In March 2005 petitioner sought assurance from the Illinois Department of Insurance that the accounting with regard to the Campbell II amount was valid. James Hanson, acting assistant deputy director of the department, gave such assurance in a reply letter.

All of the issues raised in the petition were settled, except for the AMT issue and the loss reserve issue. This Court agreed to consider those two issues separately. The

Court issued an Opinion on the AMT issue on June 23, 2008. *State Farm Mut. Auto. Ins. Co. & Subs. v. Commissioner,* 130 T.C. 263 (2008). A trial on the loss reserve issue was held on December 9 and 10, 2009, in Washington, D.C. At trial, petitioner and respondent introduced several expert reports regarding the proper method of accounting for the $202 million judgment entered against petitioner by the Utah Supreme Court in 2001.

## *Discussion*

### I. *Burden of Proof*

Petitioner bears the burden of proving, by a preponderance of the evidence, that respondent's determinations in the notice of deficiency are incorrect. See Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). However, this case is not resolved on the burden of proof. Rather, the facts are largely undisputed, and the question is primarily one of law.

### II. *Arguments of the Parties*

Petitioner argues that section 832 requires petitioner to follow the annual statement method of accounting and that the $202 million was properly included in loss reserves on the 2001 and 2002 Annual Statements. Petitioner also contends that regardless of the annual statement method, the $202 million was properly included in loss reserves under section 832(b)(5) as a loss incurred on an insurance contract.

Respondent argues that the $202 million is not deductible under section 832(b)(5) and that it should instead have been accounted for as a business expense under section 832(c). Respondent also contends that the amounts petitioner reported on its Annual Statements do not control for tax purposes and that NAIC accounting principles do not support including the $202 million in loss reserves. Finally, respondent argues that the $202 million is not deductible as a loss incurred because it is not a fair and reasonable estimate of an actual unpaid loss.

III. *Whether Section 832 Conforms to the Annual Statement Method of Accounting*

Petitioner argues that the annual statement method of accounting controls for Federal tax purposes and that the $202 million was properly included in the annual statement loss reserves. Respondent offers several reasons the annual statement method of accounting does not control for Federal income tax purposes and the $202 million was not properly included in the annual statement loss reserves. The parties disagree about the applicability of the Court of Appeals for the Seventh Circuit's opinion in *Sears, Roebuck & Co. v. Commissioner*, 972 F.2d 858 (7th Cir. 1992), affg. in part and revg. in part 96 T.C. 61 (1991), modified 96 T.C. 671 (1991).

Respondent is correct in characterizing the loss in question as extracontractual. It is not a loss covered by the liability policy of an insured. The Illinois Department of Insurance treats it as such for purposes of computing insured losses incurred. The parties dispute whether *Sears* dictates that this construction by the insurance regulators controls for Federal tax purposes.

The Court of Appeals in *Sears* held that the insurance annual statement controls as to the timing of the deduction of insured losses, and petitioner would have us apply this holding to the State's determination that these extracontractual losses should be included in current losses under the insurance contracts.

As petitioner's principal place of business is in Illinois, the Court of Appeals for the Seventh Circuit would normally have appellate jurisdiction over this case. Sec. 7482(b)(1)(B). The Tax Court will "generally defer to the rule adopted by the Court of Appeals for the circuit to which appeal would normally lie, if that Court of Appeals has ruled with respect to the identical issue." *Becker v. Commissioner*, T.C. Memo. 2006–264; see also *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

Respondent would distinguish *Sears* from the present case, arguing that factual differences render *Sears* irrelevant to our decision here. Respondent argues five points: (1) The losses in *Sears* arose from insured events and were not extracontractual; (2) petitioner has not shown the $202 million is a fair and reasonable estimate of the amount peti-

tioner would have been required to pay; (3) *Sears* did not concern a possible contravention of NAIC statutory accounting principles; (4) *Sears* did not address punitive damages; and (5) *Sears* did not involve a possible mismatching of income and losses incurred. We focus on points (1) and (4).

In *Sears*, PMI Mortgage Insurance Co. (PMI) had established $35.9 million in IBNR reserves for estimated losses and deducted that amount from income. The Commissioner contended that this deduction should be limited to $19.5 million, arguing that the insurance company should not be allowed deductions in excess of that amount for estimated losses. The Tax Court upheld the Commissioner on this issue, holding the "insurer cannot incur a loss until the insured has suffered the defined economic loss, to wit, after the lender takes title to the mortgaged property." *Sears, Roebuck & Co. v. Commissioner*, 96 T.C. at 114.

The Court of Appeals for the Seventh Circuit reversed the decision of the Tax Court in that respect, stating: "Section 832 is no ordinary rule. It expressly links federal taxes to the NAIC's annual statement". *Sears, Roebuck & Co. v. Commissioner*, 972 F.2d at 865–866. The court held that because section 832(b)(1)(A) requires insurers to use the NAIC annual statement to determine gross income, section 832 required an insurer to compute losses incurred according to the annual statement as well. *Id.* at 866. With respect to the Commissioner's attempt to ignore the requirement that companies report their losses in accordance with the Annual Statement, the court stated: "An Internal Revenue Service eager to dish out the medicine of literalism must be prepared to swallow it." *Id.* at 868. The court concluded that "State insurance commissioners' preferences about reserves thus are not some intrusion on federal tax policy; using their annual statement is federal tax law." *Id.* at 866. Having so found, the Court of Appeals ruled that because PMI followed the NAIC annual statement it was entitled to deduct the $35.9 million in loss reserves. *Id.* at 867. However, all the quoted analysis is in the context of the timing of recognition of insured losses.

IV. *How Does Section 832 Apply in the Present Case?*

The parties dispute the proper application of section 832 in this case. Petitioner maintains the result is dictated by the

requirement in section 832(b)(1) that an insurance company's gross income consists of investment income and underwriting income "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners".

Petitioner maintains that it correctly included the Campbell II punitive damages as losses incurred on the Annual Statements and this treatment was accepted by its outside accountants and the Illinois State insurance regulators. Therefore, petitioner reasons that the deductibility of the loss on its tax returns is dictated by the inclusion of the punitive damage award in its Annual Statements.

Respondent's position begins with a detailed examination of the Campbell I and Campbell II lawsuits for purposes of demonstrating that the punitive damage award is not a loss covered on an insurance contract but rather a liability petitioner incurred because of its own misconduct, not any act of its insured. Respondent is correct, and to bring the argument within section 832, respondent focuses on the phrase "losses incurred * * * on insurance contracts" in section 832(b)(5)(A). Respondent asserts that section 832 by its terms applies the annual statement rule only to insured losses, and the accounting treatment of the punitive damage award does not control the tax treatment.

Petitioner counters that the word "on" should be read to mean "related to", "caused by", "derived from", or "because of". The implication of petitioner's counterargument is that Congress has delegated to the insurance regulators the job of deciding which losses are caused by insurance contracts, and respondent has no business second guessing the regulators' acceptance of petitioner's effort to find a causal connection between the punitive damage award and petitioner's automobile insurance contracts.

Petitioner argues that *Sears* fully supports the preeminence of the annual statement in tax accounting for insurance losses. Although *Sears* addressed only the timing of inclusion of insured losses in computing gross income, petitioner maintains that the opinion of the Court of Appeals supports petitioner's position that Congress has ceded the computation of insurance premium gross income to the insurance industry regulators. *Sears, Roebuck & Co. v. Commissioner*, 972 F.2d at 866.

Petitioner also references the legislative history and the regulations to support the position that neither Congress nor the Secretary envisioned exceptions to the reliance on the annual statement to dictate the computation of insurance gross income beyond the exception noted in the regulations regarding salvage value. See S. Rept. 99–313, at 499, 501, 503 (1986), 1986–3 C.B. (Vol. 3) 1, 499, 501, 503; H. Conf. Rept. 99–841 (Vol. II), at II–358 (1986), 1986–3 C.B. (Vol. 4) 1, 358; sec. 1.832–4(c), Income Tax Regs. Petitioner also cites section 846(b)(1), which provides the details for the computation of "discounted unpaid losses" used in section 832(b)(5)(A). Section 846(b)(1) defines "undiscounted unpaid losses" as "the unpaid losses shown in the annual statement filed by the taxpayer for the year ending with or within the taxable year of the taxpayer." [3]

Respondent's principal counterargument is that this loss was not an insured loss. Punitive damages are in the nature of a punishment to modify behavior, not a foreseen result of meeting an obligation to cover an insured event.

Petitioner accounted for the $202 million by increasing its unpaid loss reserves on its 2001 and 2002 Annual Statements. On their facts, SSAPs Nos. 5 and 55 and INT 03–17 do not clearly state whether a loss such as that in Campbell II can be properly included in loss reserves. However, the Illinois Department of Insurance expressed through its actions that the initial Campbell II award was properly included in loss reserves.

As required by Illinois law, petitioner's Annual Statements were reviewed by PwC and by the State Examination Team acting for the Illinois Director of the Department of Insurance. Both PwC and the Examination Team were aware of the Campbell II litigation and petitioner's inclusion of the $202 million (discounted) in its loss reserves. In spite of this awareness, neither PwC nor the Examination Team indicated that such accounting was improper. PwC filed a report with the State of Illinois setting forth PwC's opinion that petitioner's reserves: (1) Met the requirements of Illinois insurance laws; (2) were computed in accordance with generally accepted reserve standards and principles; and (3)

---

[3] We note that petitioner's arguments regarding congressional purposes are similar to those this Court rejected in evaluating estimates of losses used in an annual report in *Physicians Ins. Co. of Wis. & Subs. v. Commissioner*, T.C. Memo. 2001–304.

made a reasonable provision for all unpaid loss and loss adjustment expense obligations of petitioner. The Examination Team issued a report which included the loss reserve amount relating to Campbell II. This report was adopted by the director of the Illinois Department of Insurance.

Petitioner's argument is that the Annual Statement controls the tax treatment for nonclaim payments as well as claim payments, and petitioner relies upon *Sears* for this proposition. As we stated previously, *Sears* addressed estimated insured losses and this case is about extracontractual losses. While sections 832(b)(5) and 846(d) do not provide specifically that the term "losses" is limited to the payment of claims on insured coverage, section 832(b)(5) follows the definitions of "underwriting income" and "premiums earned on insurance contracts" in section 832(b)(3) and (4), and the context implies that losses incurred are insured losses on the payments of claims. The question is whether respondent may diverge from the Annual Statement treatment in the context of these extracontractual losses. We believe respondent has the better side of this argument.

Insurance accounting is an evolving area, and the inclusion of extracontractual losses in loss reserves moves the Annual Statement treatment beyond the accounting of insurance policies revenue to broader issues of liability. While it is not our province to make judgments on the appropriateness of this insurance regulating treatment, we are charged with determining whether the tax provisions were intended to cede decisions on the deductibility for income tax purposes of extracontractual payments to the insurance regulators. In the light of the statutory regime we are not convinced that section 832(b) was intended to have the Annual Statement control the treatment of extracontractual losses for Federal tax purposes. Punitive damage awards are not an inherent component of insurance underwriting and can arise in many contexts. Ordinary and necessary expenses of an insurance company are generally allowable under section 832(c)(1) as provided in section 162. There is no reason to presume that Congress intended that section 832(b)(5) be the applicable section to determine tax deductions for punitive damage awards. To adopt petitioner's position would require that its contingent liability for a punitive damage award that was incurred on account of its own misconduct and was foreign

to its normal experience of underwriting risks be allowed under section 832(b)(5) as losses incurred. We hold to the contrary. Accordingly, we do not consider the Court of Appeals' analysis in *Sears* controlling regarding these extracontractual losses.

V. *Alternative Arguments*

Having reached the conclusions explained above, we do not reach respondent's alternative arguments.

VI. *Conclusion*

We hold petitioner may not include the original Campbell II award in loss reserves under section 832(b)(5). We have considered all arguments made, and to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*